### In re ZONAGEN, INC. SECURITIES LITIGATION

**James M. Nathenson, et al., Plaintiffs,**

v.

**Zonagen, Inc., et al., Defendants.**

**No. CIV.A. H–98–0693.**

United States District Court,
S.D. Texas,
Houston Division.

June 13, 2003.

Roger B. Greenberg, Schwartz Junell et al., Houston, TX, Donald J. Enright, Finkelstein Thompson & Loughran, Burton H. Finkelstein, Finkelstein Thomas & Loughran, Washington, DC, Wallace A. Showman, Attorney at Law, New York City, Roger Farrell Claxton, Claxton & Hill PLLC, Tim K. Goss, Capshaw Goss et al., Dallas, TX, Andrew L. Barroway, Schiffrin & Craig, Bala Cynwyd, PA, for Plaintiffs.

David D. Sterling, Baker Botts LLP, Houston, TX, for Defendants.

### *MEMORANDUM AND ORDER*

LAKE, District Judge.

Pending before the court are the Motion for Summary Judgment (Docket Entry No. 98) and the Motion to Exclude the Testimony of Plaintiffs' Expert Gary L. French (Docket Entry No. 103) filed by Zonagen, Inc. ("Zonagen"), Joseph Podolski, Steven Blasnik, and Martin Sutter

(collectively "Defendants"). Also pending before the court are the Motion to Strike the Submissions and Testimony of Defendants' Designated Patent 'Expert,' John T. Goolkasian, Esq. (Docket Entry No. 104) and the Motion to Strike the Submissions of Defendants' Expert, Frederick C. Dunbar, and to Bar Mr. Dunbar's Testimony (Docket Entry No. 106) filed by Plaintiffs.[1] For the reasons stated below, Defendants' Motion for Summary Judgment will be granted, Defendants' Motion to Exclude the Testimony of Gary L. French will be granted in part and denied in part, and both of Plaintiffs' pending motions will be denied.

## I. *Background and Facts*

The facts of this case are set forth in the court's March 31, 1999, Opinion and Order (Docket Entry No. 57) and in the Fifth Circuit's opinion, *Nathenson v. Zonagen, Inc.*, 267 F.3d 400 (5th Cir.2001). The live complaint in this case is the Consolidated Amended Complaint ("CAC") (Docket Entry No. 21), which alleges violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and of SEC Rule 10b–5. On March 31, 1999, the court dismissed the CAC pursuant to Rules 12(b)(6) and 9(b). (Final Judgment, Docket Entry No. 58) Plaintiffs appealed and the Fifth Circuit vacated the court's judgment and remanded the case for further proceedings. *Nathenson*, 267 F.3d at 426. On August 28, 2002, the court entered a Memorandum and Order (Docket Entry No. 82) concluding that Plaintiffs had stated a valid claim for securities fraud with respect to four statements Defendants made concerning the scope of coverage of United States Patent No. 5,565,466 (the "Zorgniotti patent") (Docket Entry No. 101, Exhibit K). The only claims remaining in this case are those premised upon the four statements concerning the Zorgniotti patent.

Zonagen published the following statement in a June 24, 1996, press release:

> Zonagen, Inc.... announced today that it has received notification from the United States Patent and Trademark Office that the patent covering the [2] use of VASOMAX ™ as a treatment for erectile dysfunction (impotency) has been allowed. The company noted the approval was granted for the first of two separate applications associated with VASOMAX ™. The second, more recent application, is still pending.

> . . . . .

> 'The approval of our U.S. VASOMAX ™ patent, the VASOMAX ™ IND submission and the selection of our Phase III development team are crucial events in our commercialization strategy,' declared Joseph S. Podolski, President and CEO, Zonagen, Inc....

(June 24, 1996, Press Release, Docket Entry No. 99, Exhibit 1, Attachment A) On appeal, the Fifth Circuit explained

> [i]f, as plaintiffs have alleged, Vasomax was at all times intended to be administered only as a pill or tablet to be swallowed and dissolved in the stomach, then it was plainly not covered by the Zorgniotti method of use patent which clearly and affirmatively excluded that method

---

1. All references to "Plaintiffs" are to the class of plaintiffs as defined in the Order Certifying Class (Docket Entry No. 97) entered on December 17, 2002.

2. There was a discrepancy noted on appeal as to whether the June 24, 1996, press release used the phrase "the use" or "its use." The Fifth Circuit stated that the district court on remand should resolve this discrepancy and determine whether any sanctions are called for. *Nathenson v. Zonagen*, 267 F.3d at 423 n. 22. It appears undisputed that the press release states "the use." Neither party has pursued sanctions and the court concludes that sanctions are not justified.

of use. It was hence false and misleading for the June 24, 1996 press release to state that 'Zonagen Inc. announced . . . that the patent covering its [sic] use of Vasomax (TM) as a treatment for erectile dysfunction (impotency) has been allowed.' The patent did not "cover" Zonagen's use of Vasomax, but rather affirmatively excluded that use.

*Nathenson,* 267 F.3d at 423 (emphasis omitted, ellipsis in original). In its August 28, 2002, Memorandum and Order (Docket Entry No. 82), however, the court concluded that because the June 24, 1996, press release was not accompanied by a positive change in the price of Zonagen's stock, fraud-on-the-market reliance was lacking and it was therefore not actionable under the federal securities laws. (Docket Entry No. 82 at p. 9)

On March 31, 1997, Defendants filed a Form 10–K with the SEC, which, along with several disclaimers and caveats, stated:

[i]n April 1994, the Company [Zonagen] acquired the rights to a patent application for the use of phentolamine mesylate ('Phentolamine') as an 'on demand' oral treatment for male impotency.

.　　.　　.　　.　　.

The Company has one issued patent and one pending United States patent application with respect to its male impotency technology (Vasomax ™). As with all patent applications, there is no guarantee that a patent directed to a specific aspect of the Vasomax ™ technology will ultimately issue.

(March 31, 1997, Form 10K, Docket Entry No. 99, Exhibit 1, Attachment D at pp. 3, 8) In a June 11, 1997, Form S–3 Zonagen stated that "the Company acquired rights in 1994 to certain technology which formed the basis for the Company's development of its proposed Vasomax product." (Docket Entry No. 99, Exhibit 1, Attachment E at p. 26) The June 11, 1997, Form S–3 also stated, however, that "[t]he Company's issued U.S. patent relating to Vasomax is a method-of-use patent that covers only the use of certain compounds to treat specified conditions, rather than a composition-of-matter patent which would cover the chemical composition of the active ingredient." *Id.* at p. 7. Zonagen's July 22, 1997, prospectus made the same statements as the June 11, 1997, Form S–3. (Docket Entry No. 99, Exhibit 1, Attachment F at pp. 7, 26) Finally, on August 26, 1997, Raymond James & Associates, Inc. published a report stating that

Zonagen has rights to an issued patent, the Zorgniotti patent, which covers the oral administration of phentolamine for systemic treatment of male erectile dysfunction. This patent is a method of use patent which protects the fundamental and unobvious discovery that phentolamine could be used in this manner.

(Raymond James & Assoc. Report, Docket Entry No. 99, Exhibit 4, Attachment A at p. 13) [3]

The Fifth Circuit explained that while the statements contained in the March 31, 1997, Form 10–K, the June 11, 1997, Form

---

**3.** Plaintiffs have failed to present any evidence that Defendants approved of, adopted, or otherwise entangled themselves with the statements contained in the Raymond James & Associates report. Therefore, even if otherwise actionable, liability cannot be premised upon the statements made in the Raymond James & Associates report. *In re Azurix Corp.*

*Securities Litigation,* 198 F.Supp.2d 862, 886 (S.D.Tex.2002). Defendants are also entitled to summary judgment with respect to Plaintiffs' claims premised upon the Raymond James & Associates report for the reasons stated in the remainder of this Memorandum and Order.

S-3, and the July 22, 1997, prospectus[4] might not by themselves be considered false or misleading, because the statements in the June 24, 1996, press release had never been retracted or modified, a fact-finder could determine that readers of the 1997 patent-related statements understood them as referring to the patent as described in the June 24, 1996, press release. *Nathenson,* 267 F.3d at 423–24. In other words, the representations made in the June 24, 1996, press release could be read by a fact-finder as having been in effect "carried forward" to March, June, and July of 1997. *Id.* at 424.

On November 18, 1997, what Plaintiffs characterize as the "truth" was published in a report published by Asensio & Co. The report stated, at page 2, that

> Zonagen does not possess a patent on the Vasomax formulation.

> . . . . .

> The Zorgniotti patent is not relevant to Zonagen's 'impotence pill' business. On the contrary, the Zorgniotti patent specifically describes the drawbacks associated with oral administration of a drug in an attempt to effect delivery to a specific site.

(Docket Entry No. 101, Exhibit N at second unnumbered page)[5] The report also mentioned a number of other factors indicating that Zonagen's stock was overvalued at the time.

Plaintiffs claim that after Asensio & Co. published its report, Zonagen's stock price dropped significantly. According to Plaintiffs, Defendants' false statements concerning the coverage of the Zorgniotti patent caused the value of Zonagen's stock to be artificially inflated, and that once the truth about the Zorgniotti patent was revealed the stock dropped to its actual value. The parties have conducted discovery and Defendants now move for summary judgment on all of Plaintiffs' remaining claims.

## II. *Analysis*

### A. Standard of Review on a Motion for Summary Judgment

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact, and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Rule 56(c) requires "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The party moving for summary judgment bears the initial burden of identifying the evidence that it believes demonstrates the absence of a genuine issue of material fact. *Id.* at 2553. If the party moving for summary judgment meets this initial burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show that specific facts exist over which there is a genuine issue for trial. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc). The party opposing summary judgment must identify specific evidence in the record and articulate the precise manner in which that evidence supports his or her claim. *Forsyth v. Barr,* 19 F.3d 1527, 1537

---

4. Collectively, the portions of these three documents that relate to the Zorgniotti patent, which form the remainder of Plaintiffs' claims in this case, will sometimes be referred to as the "1997 patent-related statements."

5. On the same day Asensio & Co. published a press release announcing the release of the report and summarizing its contents. (Asensio & Co. Press Release, Docket Entry No. 101, Exhibit M)

(5th Cir.1994). Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075. The court should not, in the absence of proof, assume that the nonmovant could or would prove the necessary facts. *Id.*

## B. Securities Fraud

To prevail on a claim under Section 10(b) of the Securities Exchange Act and SEC Rule 10b–5, Plaintiffs must show "in connection with the purchase or sale of securities, (1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately caused [the plaintiffs'] injury." *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 406–07 (5th Cir.2001)(internal quotation marks omitted; alteration in original). In their Motion for Summary Judgment Defendants argue that Plaintiffs cannot prove any of these elements.

### 1. *Misstatement or Omission*

■ Defendants argue that the statements in the June 24, 1996, press release were not false or misleading because the Zorgniotti patent "covers" the use of a fast-dissolving tablet for treatment of erectile dysfunction ("ED"). Defendants also characterize the Zorgniotti patent as covering an "on-demand" treatment for ED. Defendants argue that the claims of the Zorgniotti patent cover the administration of phentolamine in tablet form, as long as the tablet dissolves at least partially and allows some absorption of phentolamine into the bloodstream through mucosal tissues upstream of the stomach. According to Defendants, the June 24, 1996, press release was not false because competitors would be excluded from copying Vasomax, which at the time was an extremely fast-dissolving tablet that allowed absorption of phentolamine to begin in the mouth as soon as the tablet touched the patient's tongue.

■ To determine whether the statements appearing in the June 24, 1996, press release were false, the court must first determine the scope of the claims of the Zorgniotti patent. Then the court must determine whether Vasomax falls within the scope of the properly construed claims. This is the same analysis a court would be required to perform in the patent infringement context. "An infringement analysis involves two steps. First, the court determines the scope and meaning of the patent claims asserted, and then the properly construed claims are compared to the allegedly infringing device." *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed.Cir.1998) (en banc). Claim construction is a question of law for the court, while application of the properly construed claims to the product or process in question is a question of fact for the jury. *TechSearch, L.L.C. v. Intel Corporation*, 286 F.3d 1360, 1369–70 (Fed.Cir.), *cert. denied*, 537 U.S. 995, 123 S.Ct. 436, 154 L.Ed.2d 363 (2002). In construing patent claims, the court should look first to the intrinsic evidence of record, including the patent claims, the specification, and the prosecution history. When the intrinsic evidence unambiguously defines the scope of the claimed invention, reference to extrinsic evidence, such as expert testimony, is improper. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582–83 (Fed. Cir.1996). Neither party has demonstrated that the claims of the Zorgniotti patent are ambiguous. The court concludes that a proper construction of the claim terms at issue in this case can be made by reference to the patent claims and the patent specification. Neither party has provided the court with any part of the prosecution

history, and neither party has argued that reference to the prosecution history is necessary for a proper construction of the claims. Reference to extrinsic evidence is therefore unnecessary, and all expert testimony relating to the proper construction of the claims will therefore be disregarded.

Claim 1 of the Zorgniotti patent recites

1. In a method for improving sexual responsiveness in a human by administering a vasodilator agent to blood circulation in an amount effective to increase blood flow to the genitalia, the improvement comprising improving sexual responsiveness on demand *by administering an effective amount of the agent by a route selected from the group consisting of oral mucosal, intranasal, and rectal.*

(Zorgniotti patent, Col. 16, lines 2–8) The unambiguous language of the underlined portion of Claim 1 clearly limits the scope of the claim to the administration of an "effective amount" by a specified route.

Defendants argue that the claim covers any method that results in delivery of an "effective amount," as long as some (but not necessarily an effective amount) of the agent is delivered through the specified route. This is a strained, result-driven construction. "An effective amount of the agent" is clearly what is "administered." Defendants' claim construction is not supported by the claim language or by the patent specification. Therefore, a method that delivered some, but not an effective amount, of the agent via the specified route would not infringe Claim 1. Accordingly, a tablet that delivered some, but not an effective amount, of the agent by one of the recited routes would not be "covered" by Claim 1.

Claim 9 recites a similar limitation. Claim 14, while changing the sentence structure slightly, should be construed to have the same meaning. The other two independent claims,[6] 12 and 13, recite a method for buccal administration of a specific mass of the drug (20mg in Claim 13, for example) resulting in an improvement in erectile ability within a certain amount of time (about 10 minutes to about 20 minutes in Claim 13, for example). Thus, all of the claims of the Zorgniotti patent are limited to methods involving administration of a vasodilator agent in a specified amount (either an "effective" amount or a particular quantity) by a specified route.

Plaintiffs have presented evidence that the phentolamine in the Vasomax tablet, while possibly beginning the absorption process in the mouth, would not be absorbed in an effective amount through the tissues in the mouth. (Lowrey Depo., Docket Entry No. 101, Exhibit D at pp. 30–31) Plaintiffs have also presented evidence that the effective amount of phentolamine in Vasomax is actually absorbed in the stomach. *Id.* at pp. 32–33. The Zorgniotti patent specifically states that absorption of the vasodilator agent in the stomach is to be avoided in order to bypass processing in the liver. (Zorgniotti patent, col. 6, line 57—col. 7, line 28) The claims of the Zorgniotti patent do not include within their scope methods of administration where the effective amount of vasodilator agent is absorbed only in the stomach. Therefore, at least according to the evidence presented by Plaintiffs, the June 24, 1996, statement that "the Patent covering the use of VASOMAX ™ as a treatment for erectile dysfunction (impotency) has been allowed" was false or misleading when made.

---

**6.** Claims 2–8, 10–11, and 15–17 are dependent claims, which means they include all of the limitations of at least one of the independent claims.

Although Defendants have presented some evidence that some phentolamine may be absorbed prior to reaching the stomach (Podolski Depo., Docket Entry No. 101, Exhibit E at p. 84), Defendants have presented no evidence of how much phentolamine is absorbed. In fact, it appears that Defendants have no data relating to the amount of phentolamine absorbed before reaching the stomach. *Id.* A question of fact therefore exists regarding whether the statements in the June 24, 1996, press release were false when made.

Defendants argue that Plaintiffs have presented no evidence that the statements made in the June 24, 1996, press release were "carried forward" to the statements made in 1997. *See Nathenson,* 267 F.3d at 424 (noting that a fact-finder could determine that a reader of the 1997 patent-related statements could reasonably understand them as referring back to the June 24, 1996, press release). But Defendants have not presented any evidence that the statements in the press release were ever retracted or otherwise clarified. In fact, Defendants maintain even now that the statements in the June 24, 1996, press release are factually accurate. (Defendants' Reply, Docket Entry No. 102 at p. 2) A fact-finder could read the series of statements relating to the Zorgniotti patent and decide, without more, whether the later statements could reasonably have been interpreted as referring to the Zorgniotti patent as described in the June 24, 1996, press release.

Defendants also argue that since the Zorgniotti patent issued on October 15, 1996, the 1997 patent-related statements would have been read with reference to the Zorgniotti patent itself, not the June 24, 1996, press release. In other words, Defendants argue that the allegedly false or misleading nature of the June 24, 1996, press release was rehabilitated by the publication of the patent itself. The court is not persuaded by the argument. While it is true that the information contained in the Zorgniotti patent would have been digested by the market, as was the press release, it is not true that mere disclosure of the Zorgniotti patent to the market would inform the market with respect to all statements made in the June 24, 1996, press release.

The publication of a patent only discloses the contents of the patent, not the nature of any particular product or process. To determine whether Vasomax is "covered" by the claims of a patent, one must know something about the patent as well as something about Vasomax itself. The June 24, 1996, press release tied both things together when it stated that the patent covered the use of Vasomax as a treatment for ED. One cannot determine from the publication of the patent alone whether Vasomax is or is not "covered" by the Zorgniotti patent if one does not know the nature of the Vasomax product. While publication of the patent is certainly relevant to whether the 1997 statements carried forward the falsity of the June 24, 1996, press release, its publication does not compel the conclusion that the 1997 patent-related statements could not have been read as relating back to the June 24, 1996, press release. Defendants' motion for summary judgment on this ground will therefore be denied.

### 2. *Materiality*

█ A statement is material if "there is a substantial likelihood that the false or misleading statement would have been viewed by the reasonable investor as having altered the 'total mix' of information made available." *ABC Arbitrage Plaintiffs Group v. Tchuruk,* 291 F.3d 336, 359 (5th Cir.2002) (internal quotation marks omitted). In other words, "a statement or

omitted fact is 'material' if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *Id.* The statements at issue here were clearly material. There can be no doubt that statements regarding patent protection for one of a company's main products would be extremely important to a reasonable investor in making a decision to invest. This conclusion is supported by the June 24, 1996, press release itself, which states "[t]he approval of our U.S. VASOMAX™ patent ... [is a] crucial event[ ] in our commercialization strategy." (Docket Entry No. 99, Exhibit 1, Attachment A) Defendants' motion for summary judgment on the issue of materiality will therefore be denied.

### 3. *Scienter*

█ Scienter is " 'a mental state embracing intent to deceive, manipulate, or defraud.' " *Nathenson,* 267 F.3d at 408 (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976)). Severe recklessness may constitute scienter, but only in cases of " 'highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.' " *Id.* (quoting *Broad v. Rockwell Int'l Corp.,* 642 F.2d 929, 961–62 (5th Cir.1981) (en banc)). Scienter is an inherently fact-specific issue that should ordinarily be left to the trier of fact. *In re*

*Apple Computer Securities Litigation,* 886 F.2d 1109, 1113 (9th Cir.1989).

█ Defendants argue that Plaintiffs have no evidence that any Defendant acted with scienter. Defendants also argue that the evidence shows that Defendants did not act with scienter. Zonagen's chief executive officer, Joseph Podolski, testified to his honest belief that Vasomax fell within the scope of the claims of the Zorgniotti patent. (*See, e.g.,* Podolski Depo., Docket Entry No. 101, Exhibit E at pp. 160–61.) Defendants have also presented evidence that its outside patent counsel, David Clough, advised them at the time the allegedly false and misleading statements were made that the Zorgniotti patent covered the use of Vasomax as treatment for ED. (Clough Aff., Docket Entry No. 99, Exhibit 3 ¶¶ 8–10; Podolski Aff., Docket Entry No. 99, Exhibit 1 ¶ 3) Finally, Defendants have presented the testimony of a patent expert, John T. Goolkasian, that "a reasonable patent attorney would advise his clients that the claims of the Zorgniotti '466 patent would cover the use of a rapidly dissolving pill, like VASOMAX, because a rapidly dissolving pill would begin dissolving in the mouth as opposed to a pill designed to dissolve solely in the stomach." (Goolkasian Aff., Docket Entry No. 99, Exhibit 5 ¶ 17) [7]

On the other hand, however, Podolski admitted in 1998 that "no patent specifically covers Vasomax." (Fortune Article, Docket Entry No. 101, Exhibit L at eleventh unnumbered page) Although during his deposition Podolski made an attempt to explain this statement (Podolski Depo., Docket Entry No. 101, Exhibit E at p. 163), it would be up to a fact-finder to

---

**7.** Although the court has considered Goolkasian's opinion on this point, the court has not otherwise considered Goolkasian's opinions. Because the court will not grant Defendants' motion for summary judgment on the element

of scienter, Plaintiffs' Motion to Strike the Submissions and Testimony of Defendants' Designated Patent "Expert," John T. Goolkasian, Esq. (Docket Entry No. 104) will be denied as moot.

decide whether the explanation is sufficient. The fact remains that Podolski's statement (that no patent specifically covers Vasomax) conflicts directly with the statements made in the June 24, 1996, press release. The statement is at least some evidence of Podolski's belief that the Zorgniotti patent did not cover Vasomax. The statement is also some evidence of Podolski's recklessness as to the truth of the statements in the June 24, 1996, press release. Moreover, the Fifth Circuit found that Plaintiffs pleaded in the CAC sufficient facts to demonstrate a strong inference of scienter. *Nathenson*, 267 F.3d at 424–25. The Fifth Circuit's conclusion was based almost entirely on statements made in documents filed with the SEC and in press releases, the contents of which are not now in dispute. There is sufficient evidence from which a fact-finder could find the existence of scienter.

■ The fact that outside patent counsel advised Zonagen that the Zorgniotti patent covers Vasomax does not conclusively prove that Defendants did not act with scienter. Good faith reliance on advice of counsel is not an absolute defense to securities fraud. Instead, it represents possible evidence of an absence of intent to defraud. *United States v. Peterson*, 101 F.3d 375, 381 (5th Cir.1996) (criminal case under Rule 10b–5); *cf. United States v. Pettigrew*, 77 F.3d 1500, 1520 (5th Cir. 1996) (explaining in the context of a criminal case involving bank fraud and other non-securities related offenses that good faith reliance on advice of counsel is not a defense, but may be the basis for a jury instruction on whether the defendant possessed the requisite level of intent). Defendants' alleged good faith reliance on advice of counsel is one factor a fact-finder could consider in assessing whether scienter was present. Defendants' motion for summary judgment on the issue of scienter will be denied.

### 4. *Reliance*

■ Reliance or "transaction causation" requires that the defendant's fraud be the cause for the plaintiff's investment decision. *Nathenson*, 267 F.3d at 413. In "fraud-on-the-market" cases, such as this one, reliance may be rebuttably presumed with respect to publicly disseminated, materially misleading statements concerning companies whose shares are traded on a well-developed, efficient market. *Id.* at 414. Recovery under the "fraud on the market" theory requires, however, that "the complained of misrepresentation or omission have *actually affected* the market price of the stock." *Id.* at 415 (emphasis added). "Where there are culpable material nondisclosures respecting shares traded on a well developed market, the plaintiff [can] recover under the fraud-on-the-market theory '*if he [can] prove that the defendant's non-disclosures materially affected the market price of the security.*'" *Id.* at 414 (emphasis added) (quoting *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1120–21 (5th Cir.1988)). Accordingly, "where the facts properly considered by the district court reflect that the information in question did not affect the price of the stock then the district court may properly deny fraud-on-the-market based recovery." *Id.* at 415. Moreover, the presumption of reliance may be rebutted by "'[a]ny showing that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff.'" *Id.* at 414 (quoting *Basic v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 992, 99 L.Ed.2d 194 (1988)).

■ Defendants argue that Plaintiffs have presented no evidence that the price of Zonagen's stock was affected by the 1997 patent-related statements. Defen-

dants also present their own evidence showing that the price of Zonagen's stock was not affected by the 1997 patent-related statements. Plaintiffs argue that because they have demonstrated all of the prerequisites for application of the fraud-on-the-market theory, they are entitled to a presumption of reliance and therefore need not prove that the 1997 patent-related statements had any effect on Zonagen's stock price. Plaintiffs also argue that Defendants have failed to present any evidence to rebut the presumption of reliance. Plaintiffs also argue that because the market had impounded Defendants' misrepresentations about the Zorgniotti patent long before the class period, any further misrepresentations repeating the same information would not be expected to cause an increase in the stock price. Therefore, according to Plaintiffs, the fact that the 1997 patent-related statements had no effect on Zonagen's stock price does not mean that reliance does not exist.

There are several problems with Plaintiffs' analysis. First, Plaintiffs have presented no evidence that any particular misrepresentation affected Zonagen's stock price. In fact, it appears Plaintiffs have abandoned any attempt directly to show that the stock price increased by virtue of the 1997 patent-related statements, and instead have presented only evidence that Zonagen's stock price decreased after Asensio & Co. published its report. The Fifth Circuit has expressly stated in this very case that recovery under the fraud-on-the-market theory requires a plaintiff to prove that "defendant's non-disclosures materially affected the market price of the security." *Nathenson*, 267 F.3d at 414 (quoting *Abell v. Potomac Ins. Co.*, 858 F.2d 1104 (5th Cir.1988)). Absent proof that the 1997 patent-related statements actually affected Zonagen's stock price, Plaintiffs are not entitled to a presumption of reliance and recovery under the fraud-on-the-market theory is improper.

■■■ Plaintiffs have cited the testimony and report of their expert, Gary L. French, in connection with the element of reliance. Since French only opined that Zonagen's stock price fell after Asensio & Co. published its report, and not that any particular misrepresentation caused a price increase, it appears Plaintiffs may be arguing that evidence of a price decrease after the Asensio & Co. report was published is sufficient evidence of an effect on Zonagen's stock price to entitle it to the presumption of reliance. Plaintiffs have cited no authority for the proposition that a price decrease is evidence of a price increase. It would seem, however, that for evidence of a drop in price after publication of negative information to be considered evidence of an increase in price after earlier publication of positive information, a relationship between the two pieces of information must be demonstrated. In other words, to show a price increase through evidence of a price decrease, the accurate information causing the decrease must be related to the false information causing the increase. Otherwise, measuring the price effect that the positive statements had by measuring the price decrease after publication of negative statements would be an exercise in pure speculation.

Plaintiffs have presented no evidence that Zonagen's stock price actually decreased because the Asensio & Co. report revealed the falsity of the 1997 patent related statements, and not because the report revealed some other falsehood or other negative information about the company. Plaintiffs have done no independent analysis to show that it was Asensio & Co.'s discussion of the Zorgniotti patent, and not some other negative information, that caused the price to drop. In addition

to reporting that Zonagen had no relevant patent protection, the Asensio & Co. report stated that Zonagen had not filed a new drug application with the FDA; that phentolamine is not effective in treating ED; that Vasomax would never be approved by the FDA as an oral treatment for ED; that Viagra, a competing oral treatment for ED, had been granted expedited review status by the FDA, and was a far more promising oral treatment for ED; and that "[i]t is absurd to claim Vasomax will take any share from Viagra." (Asensio & Co. Report, Docket Entry No. 101, Exhibit N at first unnumbered page) The fact that Vasomax would not be competitive with Viagra would itself devalue Zonagen's share price. Plaintiffs have made no attempt to show that it was the negative information about the Zorgniotti patent, and not the threat of competition, for example, that caused Zonagen's share price to drop. It therefore makes no sense to conclude that the decrease in Zonagen's stock price after Asensio & Co. issued its report is proof that Zonagen's stock price rose after Defendants made the 1997 patent-related statements.[8]

Moreover, assuming that the price actually did drop because the Asensio & Co. report revealed the falsity of the 1997 patent-related statements, Plaintiffs have presented no evidence that the 1997 patent-related statements were the only false statements to the same effect having a positive impact on the stock price. In other words, if, as Plaintiffs argue, Defendants made similar false statements before 1997 that induced an increase in the stock price, a stock price decrease upon publica-tion of the falsity of the 1997 statements does not necessarily indicate that the price increased in 1997, as opposed to when the earlier, similar statements were made. Plaintiffs actually appear to have conceded that the 1997 patent-related statements did not affect Zonagen's stock price. Plaintiffs now argue that statements made before 1997 actually caused the stock price to increase, and that the 1997 patent-related statements, as mere repetitions of false information, would not cause an increase in Zonagen's stock price. (Plaintiffs' Opposition, Docket Entry No. 100 at pp. 22–23) If Plaintiffs concede that statements other than the 1997 patent-related statements were the cause of the price increase, then it makes no sense to argue that the price decrease after Asensio & Co. published its report is evidence that the 1997 patent-related statements had an effect on the stock price.

Plaintiffs have attempted to get around the fact that they have no evidence of which particular false or misleading statements actually affected Zonagen's stock price by arguing that they simply need not do so. Plaintiffs argue that taken as a whole, all of Defendants' misrepresentations about the Zorgniotti patent artificially inflated Zonagen's stock price. Plaintiffs argue that "Zonagen had been touting this patent application and its potential importance since it had bought it from the inventor during April 1994. As such, the market had already factored the protection from competition this patent would supposedly provide into the stock price before the Class Period had even begun." (Plain-

---

8. Plaintiffs argue that the court's prior opinions, as well as those of the Fifth Circuit, conclusively establish that only the 1997 patent-related statements affected Zonagen's stock price. As will be discussed in more detail below, in connection with the element of loss causation, this conclusion is wrong.

The court left open the possibility that several other statements may have affected Zonagen's stock price. Moreover, no opinion of this court or the Fifth Circuit even addressed whether the threat of competition might have affected the value of Zonagen's stock.

tiffs' Opposition, Docket Entry No. 100 at p. 23)

This argument is flawed. Although both sides' experts agree that markets may impound positive information over time, Plaintiffs have presented no factual evidence to show that this occurred in this case. Attorney argument is not evidence. As will be discussed in more detail below, Plaintiffs' expert, Gary L. French, merely assumed that the patent-related statements were impounded into the stock price by 1997. The closest Plaintiffs get to providing evidence that the totality of Defendants' patent-related statements increased Zonagen's stock price over time is French's comment in a footnote in his report that "[t]hough individual positive announcements had little immediate effect, over time the accumulation of false announcements gradually inflated Zonagen's share price." (French's 2d Aff., Docket Entry No. 101, Exhibit Q at p. 7 n. 13) French provides no factual support for this statement. French does not even point out which "announcements" he is referring to. At best, French's statement is a conjecture that Zonagen's stock price could have risen over time, but it is certainly not a valid opinion supported by fact and theory. The court will therefore disregard French's above-quoted statement under Federal Rule of Evidence 702. French also states that because market participants expect small start-up biotechnology companies like Zonagen to own the property rights to new technologies and be in the process of developing new products, positive news about patent protection would be expected and would not have moved the stock price upward. (French's 2d Aff. ¶ 19) This appears to be another conjecture. Plaintiffs have not shown that French is qualified to render an expert opinion relating to market expectations for start-up biotechnology companies, or that French has any specialized knowledge relating to biotechnology companies or start-up companies. (*See* French's C.V., Docket Entry No. 101, Exhibit O, Appendix A at unnumbered p. 1) Nor has French provided any factual support for this statement. It will also be disregarded under F.R.E. 702.[9]

Even assuming that the statements to which Plaintiffs are referring (that Defendants had been "touting" the patent application since before the class period)[10]

---

9. There are several other problems with Plaintiffs' citation of French's opinions in connection with the element of reliance. First, it does not appear that French was retained to provide an opinion on reliance. French states "Plaintiffs' counsel have retained Nathan Associates Inc. and me to quantify the aggregate economic damages inflicted on class members as a result of defendants' allegedly illegal acts." (French Aff., Docket Entry No. 101, Exhibit O ¶ 6) French does not include in his report any opinion that any particular misrepresentation caused an increase in Zonagen's stock price. In fact, French explained in his deposition that he did not analyze whether any statement made in 1997 caused an increase in Zonagen's stock price, and that he only analyzed the decrease in stock price after Asensio & Co. published its report. (French Depo., Docket Entry No. 101, Exhibit X at pp. 69–71) French also explains that his analysis shows only how much the price dropped, and assumes that the price was inflated due to false statements related to the Zorgniotti patent. *Id.* at p. 154. Because French assumes that Zonagen's stock price was inflated due to misrepresentations about the Zorgniotti patent, it is circular to resort to French's opinion as evidence of reliance. French's opinions simply do not constitute evidence of reliance. The court has considered but found irrelevant to the issue of reliance all of French's opinions, except the two statements discussed in the main text. Because the court has disregarded those two statements, Defendants' Motion to Exclude French's expert testimony will be granted in part and denied in part.

10. These apparently include statements made before the class period and statements not even alleged to be actionable in the CAC.

caused the stock price to rise, there is no indication that those statements are themselves actionable. To be actionable under the securities laws, not only must a statement be relied upon, but it also must be false and/or misleading, material, made with scienter, and a cause of the plaintiff's damages. *Nathenson*, 267 F.3d at 406–07. Because Plaintiffs have not specifically identified which statements they are now claiming caused an increase in the stock price, it is impossible to tell whether any of the statements that Plaintiffs claim actually induced an increase in the stock price were false or misleading, or made with scienter, for example. Plaintiffs seem to be arguing that they can combine one set of unidentified statements, which induced an increase in the stock price, with another set of otherwise actionable statements, i.e., the 1997 patent-related statements, which had no effect on the stock price, and salvage a viable cause of action. Plaintiffs have not explained to the court why such an approach should be recognized under the federal securities laws and have cited no authority supporting such an approach.

Apparently recognizing that 1997 patent-related statements (the only actionable statements left in the case) had no effect on Zonagen's stock price, Plaintiffs now argue that the stock price was nevertheless "affected" because the 1997 patent-related statements were repetitions of previous misrepresentations, which were themselves impounded into the stock price before the class period. In support of their argument Plaintiffs cite the following example given by the Fifth Circuit.

> [I]f the market believes the company will earn $1.00 per share and this belief is reflected in the share price, then the share price may well not change when the company reports that it has indeed earned $1.00 a share even though the report is false in that the company has actually lost money (presumably when that loss is disclosed the share price will fall).

*Nathenson*, 267 F.3d at 419. Two premises underlie the Fifth Circuit's example: (1) that the market believes a particular fact (that the company will earn $1.00) and (2) that the fact is reflected in the share price.

Assuming that by 1997 the market believed the Zorgniotti patent covered Vasomax, under the Fifth Circuit's example fraud-on-the-market reliance might exist with respect to misrepresentations that do not induce a change in the stock price, *provided that* the 1997 stock price already reflects the belief that the patent covers Vasomax. Plaintiffs still must *show* that the 1997 stock price reflected the market's expectation of patent coverage. Plaintiffs must also show that the value of that expectation is greater than zero. Direct application of the Fifth Circuit's example does not exonerate plaintiffs from showing that the stock price was affected. It merely requires the plaintiff to show that some prior statement affected the stock price.

The logic of this conclusion is demonstrated by considering the hypothetical case where the value of the market's belief in patent coverage is zero. In other words, the market never reacted to the news of patent coverage. Of course, repeating the facts relating to patent coverage would have no effect on the stock price. Therefore, since the market was not (never was) affected by statements relating to patent coverage, the fraud-on-the-market presumption of reliance is not appropriate. But according to the Plaintiffs' reading of the Fifth Circuit's example, fraud-on-the-market recovery is available based on the assumption that the information relating to patent coverage is already impounded into the market price and the logic that repeated information is not expected to alter stock prices. Of

course, Plaintiffs' logic is flawed since it would ignore that the stock price was never affected in the first instance. It follows that to avail itself of the Fifth Circuit's example, Plaintiffs must show that some earlier publication of the patent-related information had an effect on Zonagen's stock price. Plaintiffs have not done so.

The Fifth Circuit's example simply demonstrates the unsurprising proposition that if the stock price already reflects an expectation, an announcement that the expectation has come to pass may not be reflected in the stock price. Since the stock price already reflects the value of the expectation, repetition of the expectation will not cause an increase in the stock price. If reality were otherwise, a company could simply continue repeating the same information, each time experiencing a windfall increase in stock price. Moreover, the Fifth Circuit does not appear to have intended to carve out an exception to alleviate plaintiffs of the burden to show some effect on the market price. Because Plaintiffs cannot show that the patent-related statements made in 1997 or any other actionable patent-related statements had an effect on the price of Zonagen's stock,

Plaintiffs are not entitled to recover under the fraud-on-the-market theory.

Defendants have also rebutted the presumption of reliance by presenting evidence that none of the statements remaining at issue in this case had an effect on the stock price. In his affidavit, Defendants' expert, Frederick Dunbar, explains that he conducted an event study; a statistical method of measuring the effect of an event on a stock price. (Dunbar Aff., Docket Entry No. 99, Exhibit 8 ¶ 9) Dunbar analyzed the June 24, 1996, press release; the March 31, 1997, Form 10–K; the June 11, 1997, Form S–3; the July 22, 1997, prospectus; and the August 26, 1997, Raymond James & Associates report and concluded that none of these public statements caused a statistically significant increase in Zonagen's stock price. (Dunbar Aff., ¶ 11) As mentioned above, Plaintiffs have not presented any evidence in rebuttal to show that the patent-related statements had an impact on Zonagen's stock price. Defendants have thus rebutted the presumption of reliance by making an uncontradicted showing that the market was not affected by the allegedly culpable statements.[11] Defendants have "severed the link" between the Defendants' alleged

---

11. Plaintiffs argue that Dunbar's expert opinions should be stricken. Because the court is only relying upon Dunbar's opinion that none of the statements still at issue in this case affected the stock price, the court need only consider Plaintiffs' motion to strike the portions of Dunbar's opinion relevant to that issue. Plaintiffs argue that Dunbar's opinion is unreliable because he fails to account for the fact that a company's stock price may not be affected when a previously published false statement, the effect of which has already been impounded into the stock price, is repeated to the market. Plaintiffs' argument misses the point. Dunbar opined that none of the statements at issue had an actual impact on the price of Zonagen's stock. Plaintiffs do not appear to argue with the accuracy of this conclusion. Plaintiffs merely complain that Dunbar has failed to explain that the reason

for this might be the fact that the information in those statements had already been impounded into the stock price. Dunbar has not denied that this might be the case. Moreover, Plaintiffs' argument merely proves that Dunbar's conclusion is right-the 1997 patent-related statements did not cause the stock price to change. Plaintiffs' motion to exclude Dunbar's expert opinion on this ground will therefore be denied. The remainder of Plaintiffs' complaints about Dunbar's expert opinion relate to Dunbar's opinions on (1) the effect of the Asensio & Co. report, (2) whether Dr. French erred in failing to exclude the effects of non-patent related statements in the Asensio & Co. report, and (3) whether Dunbar's use of the word "materiality" is misleading. Because the court has not relied upon Dunbar's opinions in connection with any of these matters, these points are moot.

misrepresentations and the price Plaintiffs paid for the stock. *Nathenson,* 267 F.3d at 414.

In summary, Plaintiffs have failed to show that Zonagen's stock price was affected by any of the 1997 patent-related statements still remaining in this case. In addition, Defendants have rebutted the presumption of reliance under the fraud-on-the-market theory by presenting expert opinion that the 1997 patent-related statements had no effect on the stock price. Plaintiffs have not rebutted the accuracy of Defendants' expert's opinion, except by trying to have his opinion excluded, which the court has refused to do. Because Plaintiffs have failed to present evidence of an effect on Zonagen's stock price, and because Defendants have successfully rebutted the fraud-on-the-market presumption of reliance, Defendants are entitled to summary judgment.

5. *Loss Causation*

██ The loss causation requirement compels the Plaintiffs to show that there is a direct causal link between the misstatement and the claimant's economic loss. *Nathenson,* 267 F.3d at 413. To prove loss causation a plaintiff must show that the defendant's misrepresentation " 'was in some reasonably direct, or proximate, way responsible for his loss.' " *Robbins v. Koger Properties, Inc.,* 116 F.3d 1441, 1447 (11th Cir.1997) (quoting *Huddleston v. Herman & MacLean,* 640 F.2d 534, 549 (5th Cir.1981)). Although it is not necessary that plaintiff show defendant's misstatement was the sole or exclusive cause for his loss, he must show that it was a substantial or significant contributing cause. *Id.* Merely showing that the stock price was inflated when plaintiff purchased it, however, is not sufficient to demonstrate loss causation. Moreover, it is not proper to presume loss causation, even in

fraud-on-the-market cases; it must be proven. *Id.* at 1448.

██ The record in this case is almost entirely devoid of any proof of loss causation. Plaintiffs present the expert opinion of Dr. Gary French as evidence of loss causation. In his report, French does not opine directly that the Defendants' misstatements about the Zorgniotti patent caused Zonagen's stock price to increase and that the truth about those misstatements caused the stock price to decrease. Instead, French performed an event study that considers only the overall effect of the Asensio & Co. report on Zonagen's stock price. (French Aff., Docket Entry No. 101, Exhibit O ¶ 11; French Depo., Docket Entry No. 101, Exhibit X at pp. 70–71) In his report, French does not analyze the effect of any particular misrepresentation. French also assumes that all of the decrease in the stock price was due to the publication of negative patent-related information. (French Depo. at p. 154) French opines that although the Asensio & Co. report contained statements pertaining to subjects unrelated to the Zorgniotti patent, it was proper to assume that only those statements relating to the Zorgniotti patent had an effect on the price of Zonagen's stock. (French's 2d Aff., Docket Entry No. 101, Exhibit Q ¶¶ 17–20) Plaintiffs deduce from French's analysis that since the only statements that caused the price to increase were those related to the Zorgniotti patent, and since only that portion of the Asensio & Co. report relating to the Zorgniotti patent caused the price to drop, only the decrease in stock price needs to be measured to determine the increase that must have occurred when the statements were made in the first instance.

There are several problems with Plaintiffs' reliance on French's analysis. First, French has assumed the very fact he is being proffered to prove, i.e. that the 1997

782

patent-related statements caused Plaintiffs' damages. (French Depo. at p. 154) Moreover, French explained in his deposition that his only efforts to eliminate the possibility that other factors may have affected Zonagen's stock price were those related to verifying whether the court was correct in its rulings that certain public statements did not affect the stock price. (French Depo. at pp. 100–102) French concluded that he did not disagree with the court. *Id.* Plaintiffs now argue, based upon French's analysis, that only the 1997 patent-related statements caused the stock price to increase, and that since only the patent-related portions of the Asensio & Co. report caused the stock price to decrease, causation has been established.

Plaintiffs and their expert have misconstrued the court's rulings. In its March 31, 1999, Opinion and Order (Docket Entry No. 57) the court clearly held that Zonagen's stock price may have been affected by the misleading statements contained in the press releases issued on May 16, May 27, and June 13, 1997, and in the Form S–3 filed on June 11, 1997. (Docket Entry No. 57 at p. 52) The court concluded that the statements were not actionable, however, because they were not made with scienter. *Id.* The Fifth Circuit reversed that conclusion only with respect to the June 11, 1997, Form S–3. *Nathenson,* 267 F.3d at 426. The three listed press releases contained information unrelated to the Zorgniotti patent. Thus, according to the court's rulings, upon which Plaintiffs rely heavily in their causation arguments, Defendants made several statements having nothing to do with the Zorgniotti patent that may have affected the price of Zonagen's stock. Although French made some effort to determine whether the court was correct in

certain of its rulings that several statements did not affect the price of Zonagen's stock, he did not pay any attention to those statements that the court found may have affected the stock price, but which were not actionable for separate legal reasons.

Moreover, as discussed above, French did not address whether it may have been Asensio & Co.'s discussion of Viagra as a strong competitor that caused the share price to drop. Nor did French meaningfully reconcile his opinion that statements made before the class period caused the price to rise with Plaintiffs' argument that it was the 1997 patent-related statements that caused Plaintiffs' damages.

As far as loss causation is concerned, French has done nothing more than agree with the court's prior rulings. French did not undertake an independent statistical analysis of the 1997 patent-related statements to determine how much the stock price increased when they were made. Nor did French undertake an independent analysis to determine whether and how much any other event might have increased or decreased Zonagen's stock price. Because French merely relied on and verified court rulings to determine which statements affected the stock price, French's expert opinion puts Plaintiffs in no better a position than had they simply made legal arguments based upon the court's prior opinions. French's expert opinion does not constitute evidence of loss causation.[12]

█ Plaintiffs also argue that Defendants have admitted that causation exists by virtue of certain admissions Zonagen made in a related case filed in state court. In its Third Amended Petition filed in the 410th Judicial District Court of Montgom-

12. The court has considered French's expert opinion, but has found it not relevant to the issue of loss causation. Defendants motion to exclude French's expert opinion is therefore moot to the extent French has opined on loss causation issues.

ery County, Texas, against Manuel P. Asensio and others, Zonagen, Inc. alleges that "[a]s a direct and proximate result" of the statements made in the Asensio & Co. report (including those relating to the Zorgniotti patent), "Zonagen's stock price declined significantly." (Third Amended State Court Complaint, Docket Entry No. 109, Exhibit 6 ¶¶ 9, 12) Similarly, in its Response to Defendant John Wiley and Sons, Inc.'s Special Exceptions (Docket Entry No. 109, Exhibit 7), Zonagen states that Asensio & Co.'s reports made in late 1997 and early 1998 "resulted in a significant decline in Zonagen's stock price."

 The statements Plaintiffs cite as admissions were made by Zonagen, Inc., not by any other defendant in this action. Plaintiffs have failed to demonstrate that the statements made by Zonagen in state court should be considered admissions by any other defendant to this action. Moreover, the statements are not judicial admissions. "A judicial admission is a formal concession in the pleadings or stipulations by a party or counsel that is binding on the party making them," and "has the effect of withdrawing a fact from contention." *Martinez v. Bally's Louisiana, Inc.*, 244 F.3d 474, 476 (5th Cir.2001). A judicial admission is made intentionally as a waiver, releasing the opponent from proof of the fact admitted. In contrast, an ordinary evidentiary admission is merely a statement of assertion or concession made for some independent purpose and may be controverted or explained by the party who made it. *Id.* at 476–77. Statements a party makes in pleadings in one case that are inconsistent with the positions a party takes in another case may be admissible as admissions against interest and for impeachment. *Dugan v. EMS Helicopters, Inc.*, 915 F.2d 1428, 1434 (10th Cir.1990). The statements made in the state court case were not made for the purpose of withdrawing a fact from contention in this case. They are admissible, however, as ordinary evidentiary admissions.

In its state court suit Zonagen basically alleged that all of the statements in the Asensio & Co. report caused a decline in Zonagen's stock price. Zonagen did not allege that the statements relating to the Zorgniotti patent were a substantial cause of the stock decline. Nor did Zonagen state that the 1997 patent-related statements caused the stock price to increase. Thus, even if it were true that Asensio & Co.'s statements relating to the Zorgniotti patent caused the stock price to decline, that is not proof that the 1997 patent-related statements were the cause of Plaintiffs' injuries. Therefore, even if admitted into evidence, no reasonable juror could determine from the state court pleadings alone that Defendants' 1997 patent-related statements were the cause of Plaintiffs' loss. Because Plaintiffs have presented no other evidence of loss causation, Defendants are entitled to summary judgment on this issue.

## C. Section 20(a) Claims

Because Defendants are entitled to summary judgment on Plaintiffs' § 10(b) and Rule 10b–5 claims, Defendants are also entitled to summary judgment on Plaintiffs' § 20(a) claims. *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1132 (2d Cir. 1994).

## D. Defendants Blasnik and Sutter

Because Plaintiffs do not oppose Defendants' contention that defendants Blasnik and Sutter should be dismissed from this action (Plaintiffs' Opposition, Docket Entry No. 100 at p. 2 n. 2), Plaintiffs' claims against defendants Blasnik and Sutter will be dismissed.

### III. *Conclusion and Order*

For the reasons stated above, Defendants' Motion for Summary Judgment (Docket Entry No. 98) is **GRANTED**. Accordingly, this action is **DISMISSED**.

Defendants' Motion to Exclude the Testimony of Plaintiffs' Expert Gary L. French (Docket Entry No. 103) is **GRANTED in part and DENIED in part**.

The Motion to Strike the Submissions and Testimony of Defendants' Designated Patent 'Expert,' John T. Goolkasian, Esq. (Docket Entry No. 104) and the Motion to Strike the Submissions of Defendants' Expert, Frederick C. Dunbar, and to Bar Mr. Dunbar's Testimony (Docket Entry No. 106) are **DENIED**.